IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL COLEMAN,         )
         )
         Plaintiff,       )
         )
         v.         )      No. 06 C 1887
         )
JO ANNE B. BARNHART,         )
COMMISSIONER OF SOCIAL         )
SECURITY,         )
         )
         Defendant.     )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Michael Coleman ("Coleman") brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final agency decision of the Commissioner of Social Security ("Commissioner") denying Coleman's application for Supplemental Security Income ("SSI") pursuant to the Social Security Act, 42 U.S.C. §§ 1381a, 1382.  Before the Court are the parties' cross-motions for summary judgment.  For the following reasons, the Court grants the Commissioner's summary judgment motion and denies Coleman's summary judgment motion.  Accordingly, the Court affirms the ALJ's decision.

## ADMINISTRATIVE PROCEEDINGS

On November 17, 1999, Coleman applied for SSI alleging an onset date of May 17, 1999. (R. 14-1, Certified Copy of Administrative Record, at 142-43.)  The agency denied Coleman's claim initially and upon reconsideration.  (*Id.* at 47-48.)  On July 18, 2000, Coleman requested a hearing and, on August 16, 2001, an administrative law judge ("ALJ") held a hearing on Coleman's SSI claim.  (*Id.* at 58, 598-643.)  Coleman appeared with counsel and testified on his

own behalf.  (*See id.*)  A vocational expert also testified.  (*See id.*)  On November 30, 2001, the ALJ issued a hearing decision denying Coleman's claim.  (*Id.* at 503.)  Coleman then requested appellate review of the ALJ's decision.  (*Id.* at 115.)

On September 23, 2004, the Appeals Council remanded Coleman's claim for further evaluation of Coleman's mental condition.  (*Id.* at 116-18.)  On May 12, 2005, an ALJ held a hearing on remand.  (*Id.* at 516-97.)  At the hearing on remand, Coleman appeared with counsel and testified on his own behalf.  (*See id*.)  A vocational expert, Grace Gianforte, also testified. (*See id*.)  On August 26, 2005, the ALJ issued a hearing decision denying Coleman's claim.  (*Id.* at 16-46.)  Thereafter, Coleman filed a Request for Review that the Appeals Council denied.  (*Id.* at 5-7.)  The ALJ's decision is thus the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1481; *see also Prochaska v. Barnhart,* 454 F.3d 731, 734 (7th Cir. 2006).

## STATEMENT OF FACTS

### I. Hearing Testimony

#### A. Coleman's Testimony

Coleman was 33-years-old on August 26, 2005, the date of the ALJ's decision.  (*Id.* at 142, 528.)  At his hearing, Coleman testified that he went to Medill elementary school in Chicago, Illinois and that he was in the "slow class."  (*Id.* at 521.)  Medill elementary school records show that Coleman completed seventh and eighth grade with satisfactory marks, graduated from elementary school, and then went to ninth grade at Creiger High School in Chicago.  (*Id.* at 447-447A, 531-32.)  The school records, however, make no mention of Coleman attending special education classes.  (*Id*. at 447-47A.)  Coleman also testified that he dropped out of high school in the ninth grade.  (*Id.* at 521, 531-32.)  Further, Coleman stated that

he failed the test for admission into a GED program, and thus never took the GED examination. (*Id*. at 532-33.)

During the summers of 1991 and 1992, Coleman worked as a bus boy at Arlington Park Racetrack in Illinois. (*Id*. at 539.) While incarcerated in 1992 and 1993 for drug-related offenses, Coleman worked in the kitchen at an Illinois State prison. (*Id*. at 540, 542-43.) In 1995, Coleman worked for a leather company stocking the warehouse. (*Id*. at 538.) From 1997 to 1999, Coleman testified that he worked at a carwash in Milwaukee, Wisconsin until he suffered a gunshot wound to his right leg in May 1999. (*Id*. at 38, 527-28, 537, 547.) Coleman subsequently moved back to the Chicago area where he has lived intermittently with his mother. (*Id*. at 527.)

Coleman further testified that he was also incarcerated during 2003. (*Id*. at 530, 532, 544.) Moreover, Coleman testified that he used heroin, cocaine, marijuana, and alcohol. (*Id*. at 557-58.) Coleman also stated that he was unable to read well, but admitted that he could read small words. (*Id*. at 534.) He also testified that a friend helped him fill out his disability forms. (*Id*.) Coleman further stated that he was able to add numbers, count change at a store, and read a receipt. (*Id*. at 535.) In addition, Coleman had a driver's license in Wisconsin and Illinois and passed the written driver's tests. (*Id*. at 535-36.)

Moreover, Coleman testified that he took public transportation by himself, although his mother helped by giving him directions. (*Id*. at 546.) He stated that he played cards occasionally and watched television shows. (*Id*. at 561.) Coleman also testified that he was able to lift a gallon of milk and a twelve-pack of soda and was able to stand for fifteen minutes at a time before his leg became stiff. (*Id*. at 562.) In addition, Coleman testified that he was able to

sit for thirty minutes with both feet on the floor, but preferred to sit with his right leg elevated on a chair.  (*Id*. at 563.)

B.     **Vocational Expert's Testimony**

Grace Gianforte, the vocational expert at the hearing on remand, testified that Coleman had semi-skilled and unskilled past relevant work experience such as a warehouse stock worker, which required heavy exertion, and as a food service worker and car wash attendant, which required light exertion.  (*Id*. at 580.)  Gianforte considered jobs that accommodated Coleman's vocational profile of age, education, and work experience, in tandem with a residual functional capacity ("RFC") for unskilled, sedentary work activity that involved simple, repetitive tasks and did not require various postural limitations.  (*Id.* at 581-82.)  She also considered the following limitations – never push or pull with the right lower extremity; never climb ladders, ropes or scaffolds; never work on moving or unstable surfaces; occasionally climb ramps or stairs; occasionally stoop, kneel, crouch or crawl; no extremes of temperature, humidity or concentrated respiratory irritants; and no unprotected heights or unguarded hazardous equipment.  (*Id.* at 581.)

At the hearing, Gianforte testified that Coleman would be able to perform sedentary work, such as a handpacker, assembler, hand sorter/checker/examiner, which are three separate occupations.  (*Id.* at 581-82.)  Gianforte further testified that a total of 6,500 jobs existed under this category in the regional economy and that these jobs involved simple, repetitive tasks.  (*Id.* at 582.)  She further testified that literacy in English was not required to perform the essential duties of these jobs.

According to Gianforte, an individual who preferred to use a cane when ambulating farther than 15 feet could perform and sustain the work in question, but she would prefer not to

recommend placement of such a person in an industrial environment.  (*Id.* at 582-83.)  Instead, she would recommend a clerical position.  (*Id.* at 583.)  She then identified 4,500 clerical jobs, including order clerk, telephone order taker, and information clerk that accommodated the hypothetical individual.  (*Id.* at 583-84.)  She testified that these jobs required some literacy consistent with an eighth grade education.  (*Id.* at 583.)  Moreover, she testified that it was possible for an individual with a fourth grade education to perform the clerical jobs she had identified.  (*Id.* at 585.)

## II.     Medical Evidence

### A.     Knee Injury

In May 1999, Coleman was shot in the leg and a bullet lodged in his right knee joint.  (*Id.* at 182, 547.)  Thereafter, Coleman underwent surgery to repair his fractured right femur and some damaged arteries and veins in his right leg.  (*Id.* at 182-221.)  Coleman also underwent skin grafting surgery and was in rehabilitation for a month while his graft healed.  (*Id.* at 224-28, 547.)  In November 1999, a reconstructive surgeon, Dr. William Dzwierzynski, evaluated Coleman's nerve damage from the gunshot and concluded that there was a little swelling of the leg and some limitation of knee motion.  (*Id*. at 23, 262.)  Dr. Dzwierzynski diagnosed peroneal nerve injury and discussed with Coleman that this generally does not have a good prognosis in adults.  (*Id.* at 262.)

In March 2000, David Evanich, M.D., an examining orthopedic physician, reported that Coleman was able to walk with a cane within a few months after surgery.  (*Id.* at 263-64.)  Dr. Evanich's report indicates that Coleman walked with a foot-drop gait on the right.  (*Id.* at 263.)  Coleman complained of right knee pain with heavy lifting and stairs, and Dr. Evanich

recommended limits in those areas. (*Id*. at 263, 266.) Further, Coleman's pain improved when he took weight off his right leg. (*Id*. at 263, 265). Dr. Evanich diagnosed right knee pain and stiffness with disruption of medial femoral condyle. (*Id*. at 265.) Also in 2000, state agency doctors opined that Mr. Coleman could perform "most sedentary work." (*Id*. at 36, 267-74.)

In May of 2000, doctors from Cook County Hospital diagnosed deep venous thrombosis and admitted Coleman due to swelling in his right leg. (*Id*. at 276.) The doctors noted decreased sensation from the knee down and no range of motion of the ankle/foot. (*Id*. at 278, 371.) In June 2000, an ultrasound revealed venous thrombosis in the distal and mid-superficial femoral vein. (*Id*. at 369.)

In 2001, doctors at the University of Illinois at Chicago Medical Center noted that Coleman experienced right lower extremity swelling, absent sensation of the extremity, and an ulcer on the right foot. (*Id*. at 335.) Also in 2001, doctors at Cook County Hospital diagnosed unilateral lower extremity edema and instructed Coleman to elevate his right leg above the hips when it was swollen. (*Id*. at 415, 499.) Records from the Cook County Hospital also reveal that Coleman has had little movement or feeling below his knee since the gunshot wound in 1999. (*Id*. at 371.) Hospital records from October 2001 also indicate that Coleman suffered severe injury to the right peroneal and tibial nerves at the knee and the doctor diagnosed early venous stasis. (*Id*. at 421-22.) The doctor also noted chronic paresthesias and nerve damage. (*Id*. at 421.) Meanwhile, there is no documentation in the record that Coleman underwent any treatment for his knee injury – or any other impairment – from January 2001 to April 2003.

In April 2003, while incarcerated at Cook County Jail, Coleman had a medical examination, but did not complain of any right leg pain or use any device to walk. (*Id*. at 464-

65, 474.)  In September 2003, while still incarcerated at Cook County Jail, Coleman reported

right leg pain and heroin use, and thereafter was prescribed medication in anticipation of heroin

withdrawal symptoms.  (*Id*. at 474.)  In October 2003, while incarcerated at Shawnee

Correctional Center in Illinois, Coleman's physical examination was essentially normal, except

for his dropped right foot.  (*Id.* at 449-60.)  At that time, Coleman asked for a cane, a lower

bunk, and a slow walk pass.  (*Id.* at 449, 455.)

### B.  Asthma

In 2000 and 2001, Coleman was treated intermittently for asthma in the emergency

rooms at University of Illinois at Chicago Hospital and Cook County Hospital, but received no

routine medical care for this condition.  (*Id.* at 310, 315-16, 325-29, 345-46, 361-62, 429, 429A,

431-45.)  Several doctors noted that Coleman's use of heroin and cigarettes exacerbated his

asthma.  (*See id.* at 310, 325-28, 334-35.)  Coleman used an albuterol inhaler for his asthma

symptoms.  (*Id.* at 310, 326, 335, 429, 431, 436, 439-40.)  In April 2003, while incarcerate at

Cook County Jail, Coleman had medical examinations and reported asthma and the use of

inhalers.  (*Id*. at 464.)  In September 2004, December 2004, and March 2005, Cook County

Hospital treated Coleman when he ran out of his asthma medication.  (*Id.* at 405, 431-36.)

### C.  Psychologist's Examination

On March 19, 2001, William N. Hilger, Jr. Ph.D., a psychologist, evaluated Coleman's

mental functioning.  (*Id.* at 299-306.)  According to Dr. Hilger, Coleman demonstrated a

questionable level of effort during testing.  (*Id.* at 299.)  Dr. Higler noted that at times Coleman

would respond to more difficult questions, but then would miss simpler ones due to inadequate

effort.  (*Id*.)  Dr. Hilger concluded that the test results provided only minimal estimates of

Coleman's mental, intellectual, and academic functioning. (*Id.*)

Dr. Hilger reported that Coleman took the Wechsler Adult Intelligence Scale-III (WAIS-III) test and obtained a verbal intelligence quotient ("IQ") of 63, a performance IQ of 62, and a full scale IQ of 59, which placed him in the mild mental retardation range of intellectual functioning. (*Id.* at 302.) Reading and mathematics tests revealed similar deficits. (*Id.* at 303.) Dr. Hilger opined that Coleman put forth "minimal and questionable effort throughout the evaluation." (*Id.*) Further, Dr. Hilger reported that Coleman was evasive in discussing alcohol or substance abuse. (*Id.*)

### D. Alcohol or Substance Abuse

In May 2001, Coleman had an appointment to begin a drug treatment program and reported that he used alcohol, cocaine, heroin, and marijuana. (*Id.* at 379.) At that time, his medical history revealed asthma and right leg pain, but his other findings were essentially normal. (*Id.* at 376-78.) Coleman attended a methadone treatment program for approximately two weeks in May 2001. (*Id.* at 386.)

### E. Orthopedic Specialist's Examination

On June 10, 2005, James Elmes, M.D., an orthopedic specialist, examined Coleman and assessed his functioning. (*Id.* at 475- 87.) Dr. Elmes reported that right knee x-rays revealed that Coleman had a healed fracture with internal fixation and post-traumatic arthritis. (*Id.* at 476-77.) Dr. Elmes' report also indicated that Coleman used a cane on the right for ambulation. (*Id.* at 477.) Coleman's strength in his upper extremities and left leg was normal, but limited in the right leg. (*Id.*) Dr. Elmes opined that Coleman was able to lift less than ten pounds occasionally and five pounds frequently; stand and walk less than two hours in an eight-hour

workday; sit with periodic alternate sitting and standing to relieve pain; push and pull with the upper and lower extremities; climb ramps and stairs occasionally; never climb scaffolds, ladders, or ropes; occasionally balance and stoop; and never kneel, crouch, or crawl. (*Id.* at 479.) In addition, Dr. Elmes stated that Coleman had unlimited use of his hands for reaching, handling, fingering, and feeling. (*Id.* at 480.) Coleman, however, was limited from temperature extremes, vibration, humidity, and hazards. (*Id.*) Last, Coleman's corrected vision was limited to 20/40 in the right eye and 20/30 in the left eye. (*Id.* at 487.)

## STANDARD OF REVIEW

Because the Appeals Council denied Coleman's second request for review, the Court reviews the ALJ's decision as the Commissioner's final decision. *See Prochaska v. Barnhart,* 454 F.3d 731, 734 (7th Cir. 2006); 20 C.F.R. § 416.1481. The Court reviews the ALJ's legal conclusions *de novo,* but deferentially reviews the ALJ's factual determinations and will affirm the ALJ's decision if it is supported by substantial evidence. *Id.; see also* 42 U.S.C. § 405(g). "Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision." *Prochaska*, 454 F.3d at 734-35 (citation omitted). In reviewing the ALJ's decision, the Court does not reweigh the evidence, resolve conflicts in the evidence, make credibility determinations, or substitute its own judgment for that of the ALJ. *See White v. Barnhart,* 415 F.3d 654, 659 (7th Cir. 2005). Instead, the Court's review is limited to determining whether the ALJ applied the correct legal standards and if there is substantial evidence in the record to support the ALJ's factual findings. *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005).

## DISABILITY STANDARD

A claimant may receive SSI benefits if he can establish that he is disabled and has limited means. *Sienkiewicz v. Barnhart,* 409 F.3d 798, 802 (7th Cir. 2005) (citing 42 U.S.C. §§ 1381a, 1382). In determining whether a claimant is disabled, the Commissioner has created a five-step, sequential analysis. *See Briscoe,* 425 F.3d at 351; *Rice v. Barnhart,* 384 F.3d 363, 365 (7th Cir. 2004). Under this analysis, the ALJ considers whether: (1) the claimant is employed; (2) the claimant has a severe impairment (3) the claimant's impairment meets or equals any impairment listed in the regulations; (4) the claimant's residual functional capacity ("RFC") leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. *Briscoe,* 425 F.3d at 351-52; *see also* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f).

More specifically, if the claimant's impairment meets or equals one of the listed impairments at step three, the claimant qualifies for benefits and the ALJ makes no further inquiries. *Rice,* 384 F.3d at 365; *see also Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir. 2004). If the claimant does not qualify for benefits under step three, the analysis proceeds to step four, which requires the ALJ to assess whether the claimant has insufficient RFC to perform his past relevant work. *See Rice,* 384 F.3d at 365. If the impairment precludes the claimant's performance of his past work, under step five, the ALJ considers the claimant's age, education, past relevant work experience, and RFC to determine if other work exists in the national economy that would accommodate him. *Id.*; *see also Fast v. Barnhart,* 397 F.3d 468, 470 (7th Cir. 2005). The claimant bears the burden of proof through step four of this sequential analysis. *Briscoe,* 425 F.3d at 352; *see also Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004). At

step five, the burden of proof shifts to the Commissioner to establish that the claimant can successfully perform a significant number of jobs existing in the national economy. *See Briscoe,* 425 F.3d at 352; *Young,* 362 F.3d at 1000.

## ADMINISTRATIVE DECISION

In conducting the sequential analysis, the ALJ found that Coleman had not engaged in substantial gainful activity since he initially applied for SSI in November 1999. (Certified Copy of Administrative Record, at 21.) The ALJ further found that the medical evidence established a "severe" impairment within the meaning of the regulations, namely, asthma, a gunshot wound to the right leg, substance abuse, and cognitive delay, but that the impairments did not meet or equal any listed impairment under 20 C.F.R. § 404, Subpart P, Appendix 1. (*Id.* at 22-36, 45.) When evaluating whether Coleman could perform his past relevant work or any other work, the ALJ determined what work-related activities Coleman could perform despite his impairments. (*Id.* at 36.) In doing so, the ALJ found that Coleman had the RFC for unskilled sedentary work that accommodated a variety of postural and environmental restrictions. (*Id.* at 36-42.) The ALJ also found that Coleman could perform a significant number of jobs in the national economy based on the vocational expert's testimony and the framework of the medical vocational guidelines. (*Id.* at 43-45.) Thus, the ALJ concluded that Coleman was not disabled as defined by the Social Security Act. (*Id.* at 46.)

## ANALYSIS

In his motion for summary judgment, Coleman contends that: (1) the ALJ erred by adopting Dr. Elmes' opinion because the ALJ failed to account for portions of Dr. Elmes' opinion that supported Coleman's claim; (2) the ALJ failed to incorporate relevant limitations in

the hypothetical question that she posited to the vocational expert; (3) the ALJ made an improper credibility determination concerning Coleman's leg pain, swelling, and stiffness; (4) the ALJ erred by improperly analyzing the requirements in Listing 1.02 regarding the inability to ambulate effectively; (5) the ALJ failed to properly analyze Coleman's functional level of literacy and his general education level; (6) the ALJ erred by improperly relying on the vocational expert's testimony because it was inconsistent with the Department of Labor's Dictionary of Occupational Titles ("DOT"); and (7) the vocational expert failed to provide sufficient support for the breakdown of jobs by exertional and skill level in the regional economy. The Court addresses each of these challenges in turn.

## I.      Dr. Elmes' Orthopedic Consultative Examination

First, Coleman argues that the ALJ gave "significant weight" to Dr. Elmes' opinion, but failed to account for portions of Dr. Elmes' opinion that support Coleman's claims. As such, Coleman argues that the ALJ's decision "is illogical and fails to build a bridge from the evidence she relied on to her conclusion." (R. 20-1, Mem. Mot. Sum. J., at 9.) Indeed, when making a decision, an ALJ must build a logical bridge from the evidence to the conclusion. *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005). In doing so, the ALJ must "connect the dots" between the claimant's impairments – as supported by substantial evidence in the record – and the RFC finding. *See Young,* 362 F.3d at 1002-03. The ALJ, however, need not provide a "complete written evaluation of every piece of testimony and evidence." *Haynes,* 416 F.3d at 626 (citation omitted).

In assessing Coleman's RFC, the ALJ concluded:

Based on all of the evidence of the record, I find that claimant has the physical RFC to perform and sustain most sedentary work. He can lift and/or carry up to

> 10 pounds occasionally and up to 5 pounds frequently, he can push and pull within those limits with his upper extremities and left lower extremity, but cannot use foot or leg controls with his right lower extremity. He can sit throughout a normal workday, with typical breaks, and can stand and/or walk for a combined total of less than two hours in a workday, and not longer than 15 minutes at a time. He should never climb ladders, ropes or scaffold or work on moving or unstable surfaces, kneel, crouch or crawl, but can occasionally climb ramps or stairs, or stoop. He should avoid extremes of temperature, humidity, vibration, concentrated respiratory irritants, unprotected heights and unguarded hazardous equipment.

(Certified Copy of Administrative Record, at 41-42.) The ALJ further stated that she gave "significant weight" to Dr. Elmes' assessment in making her determination because he was an orthopedic specialist and examined Coleman shortly before the hearing on remand. (*Id.* at 37.)

Nevertheless, Coleman argues that, based on Dr. Elmes' report, the ALJ should have limited Coleman to lifting ***less than*** ten pounds occasionally, instead of lifting ***up to*** ten pounds occasionally. To clarify, when Dr. Elmes filled out Coleman's "Medical Source Statement of Ability to Do Work-Related Activities" (Form OMB 0960-0662), he checked the box for "less than 10 pounds" under the lifting/carrying limitation. (Certified Copy of Administrative Record, at 482.) In her conclusion, the ALJ stated that Coleman could lift and/or carry "up to 10 pounds." Here, Coleman simply fails to explain how the distinction between "less than ten pounds" and "up to ten pounds" is a rejection of Dr. Elmes' opinion in the first instance. In fact, ALJs use these terms interchangeably. *See, e.g., David v. Barnhart,* 446 F. Supp.2d 860, 864 (N.D. Ill. 2006); *Ozier v. Barnhart,* No. 03 C 2988, 2004 WL 2038540, at *4 (N.D. Ill. Aug. 11, 2004). Accordingly, Coleman's attempt to draw a distinction is misplaced.

Next, Coleman contends that the ALJ failed to take into consideration Dr. Elmes' opinion that he should periodically alternate between sitting and standing to relieve pain and discomfort. (Certified Copy of Administrative Record, at 479.) As mentioned, it is well-established that the

ALJ is not required to give a written evaluation of every piece of testimony and evidence. *See Haynes,* 416 F.3d at 626. More importantly, the ALJ clearly articulated that she relied on the record as a whole, which contains substantial evidence supporting the ALJ's findings. *See Young,* 362 F.3d at 1001 (evidence is substantial if reasonable person accepts it as adequate to support conclusion). This evidence includes Coleman's own testimony that he was able to sit for thirty minutes with both feet on the floor, but preferred to sit with his right leg elevated on a chair. (*Id.* at 563.) Coleman also testified that he could stand for fifteen minutes at a time, (*see id.* at 562) and Dr. Elmes opined that Coleman could stand and walk for less than two hours in an eight-hour workday. (*Id.* at 479.) This evidence supports the ALJ's finding that Coleman could sit throughout a normal workday with typical breaks and that he could stand and/or walk for a combined total of less than two hours in a workday, but not longer than 15 minutes at a time.

Furthermore, Coleman argues that because he cannot lift ten pounds, he is precluded from working under Social Security Ruling ("SSR") 96-9p. The ruling specifically states:

> Lifting/carrying and pushing/pulling: If an individual is unable to lift 10 pounds ***or occasionally lift and carry items like docket files, ledgers, and small tools throughout the workday***, the unskilled sedentary occupational base will be eroded. The extent of erosion will depend on the extent of the limitations. For example, if it can be determined that the individual has an ability to lift or carry slightly less than 10 pounds, with no other limitations or restrictions in the ability to perform the requirements of sedentary work, the unskilled sedentary occupational base would not be significantly eroded; however, an inability to lift or carry more than 1 or 2 pounds would erode the unskilled sedentary occupational base significantly. For individuals with limitations in lifting or carrying weights between these amounts, consultation with a vocational resource may be appropriate.

*See* 61 Fed. Reg. 34478, 34481 (emphasis added).

Coleman's cursory argument fails to take into account the alternative language – "or occasionally lift and carry items like docket files, ledgers, and small tools throughout the

workday" – which belies Coleman's argument premised on his inability to lift ten pounds.  In any event, there is substantial evidence in the record that Coleman could lift and carry items like files, ledgers and small tools, including Coleman's own testimony that he could lift a gallon of milk and a twelve-pack of soda.  (Certified Copy of Administrative Record, at 562.)

In sum, the ALJ's reasoning did not "exhibit deep logical flaws" as Coleman suggests. *See Carradine v. Barnhart,* 360 F.3d 751, 756 (7th Cir. 2004) ("agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws").  Instead, the ALJ properly connected the dots between Coleman's impairments – as supported by substantial evidence in the record – and her RFC conclusion.  *See Young,* 362 F.3d at 1002-03.

## II.     Relevant Limitations in Hypothetical

Coleman also argues that the ALJ failed to incorporate all of his relevant limitations in her hypothetical posited to the vocational expert at his hearing.  More specifically, Coleman argues that the ALJ failed to include the limitations that he could stand or walk for less than 2 hours in a workday and for no longer than 15 minutes at time.  As such, Coleman contends that because the hypothetical was fundamentally flawed, the ALJ's decision at step five cannot stand. *See Young,* 362 F.3d at 1005.

A hypothetical question is fundamentally flawed if it does not include all of the limitations supported by medical evidence in the record.  *Id.*  "The reason for the rule is to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations."  *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir. 2002).  An incomplete hypothetical question, however, may be cured by establishing

15

that the vocational expert independently reviewed the claimant's medical records and was present during the claimant's hearing testimony. *Id.*; *see, e.g., David v. Barnhart,* 446 F. Supp.2d 860, 878 (N.D. Ill. 2006). Indeed, the *Young* court explained that in most cases "imputing knowledge to the vocational expert of everything in the exhibits and testimony from the hearing will be sufficient to allow an ALJ to assume that the vocational expert included all of these limitations in his assessment of the number of jobs that the applicant can perform." *Id.* at 1003.

Here, the vocational expert had the opportunity to review the complete record and was present throughout the ALJ hearing, and thus the ALJ could impute knowledge to the vocational expert of everything in the exhibits and testimony. (Certified Copy of Administrative Record, at 576.) The vocational expert, for example, was present when Coleman testified that he could stand for fifteen minutes at a time and lift a gallon of milk and a twelve pack of soda. (*Id.* at 562.) She also reviewed Dr. Elmes' report opining that Coleman could stand and walk less than two hours in an eight-hour workday. (*Id.* at 479.)

Accordingly, the hypothetical question was not fundamentally flawed as Coleman argues because the vocational expert independently reviewed his medical records and was present during the hearing testimony. *See Young,* 362 F.3d at 1003; *Steele*, 290 F.3d at 942. Therefore, the ALJ's assessment at step-five was not in error as Coleman contends.

## III. Credibility Analysis

Next, Coleman argues that the ALJ's credibility determination concerning his testimony of leg pain and stiffness was contrary to Social Security Ruling 96-7p. *See* 61 Fed. Reg. 34483. Specifically, SSR 96-7p "outlines how an ALJ should go about assessing a claimant's credibility

when his allegedly disabling symptoms (such as pain or fatigue) are not objectively verifiable." *Arnold v. Barnhart*, ___ F.3d ___, No. 05-3462, 2007 WL 95214, at *5 (7th Cir. Jan. 16, 2007). "SSR 96-7p instructs that when 'determining the credibility of the individual's statements, the adjudicator must consider the entire case record,' and that a credibility determination 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record.'" *Prochaska*, 454 F.3d at 738. Accordingly, the ALJ must consider objective medical evidence of the claimant's impairments, his daily activities, his allegations of pain, functional limitations, and his treatment. *Id.*; *see also Arnold*, 2007 WL 95214, at *5. "Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record." *Arnold,* 2007 WL 95214, at *6.

The Court gives substantial deference to an ALJ's credibility determinations and will not overturn such determinations unless they are patently wrong. *Prochaska,* 454 F.3d. at 738; *see also Rice,* 384 F.3d at 369. "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported ... can the finding be reversed." *Prochaska,* 454 F.3d at 738 (citations omitted); *see also Sims v. Barnhart*, 442 F.3d 536, 537 (7th Cir. 2006) (reviewing court rarely disturbs credibility determinations).

In her making her credibility determination, the ALJ articulated:

Overall, I find that I can give little weight to claimant's testimony about his reportedly disabling limitations. While the objective evidence does support claimant's testimony that he continues to have difficulty with prolonged standing or walking due to the residua of the gunshot wound, claimant nevertheless is and has been able to ambulate with a single straight cane, albeit at a slower than normal pace, throughout the relevant time.

Claimant's testimony that he suffers from significant pain and stiffness in his

right leg is not well-supported by the objective evidence. He has gone for extended periods without seeking treatment for his right leg impairments, with gaps of longer than two years during which he has no documented treatment for any impairment. He often has not complained of pain or leg symptoms when he has been treated for other problems, and he has not sought nor apparently needed prescription strength pain medication.

(Certified Copy of Administrative Record, at 39-40.)

Thus, although the ALJ acknowledged that objective evidence supported Coleman's testimony that he had difficulties with prolonged standing or walking, the ALJ also observed that Coleman could ambulate with a single cane, although at a slower pace. Meanwhile, evidence in the record supports the ALJ's conclusion that Coleman did not complain of leg pain or seek medical treatment for his pain from January 2001 to April 2003. Further, there is evidence in the record that Coleman did not complain of leg pain when he was treated for other medical problems and that Coleman was not taking any prescription pain medication. *See Johnson v. Barnhart,* 449 F.3d 804, 806-07 (7th Cir. 2006) (lack of active treatment and prescription pain medication constitutes "solid ground" for disbelieving claimant's testimony regarding pain.)

Coleman nevertheless points to Dr. Dzwierzynski's November 1999 evaluation in support of his argument. In that evaluation, however, Dr. Dzwierzynski noted that there was a "little" swelling of the leg. (*Id*. at 23, 262.) There is also some evidence that doctors in 2001 noted that Coleman had swelling of the right leg and that he should keep his leg elevated when it was swollen. (*Id*. at 276, 335, 499.) On the other hand, the record also reflects that Coleman had a medical examination in April 2003 and did not complain of leg pain. (*Id.* at 464-65, 474.) Indeed, in October 2003, while incarcerated at Shawnee Correctional Center, Coleman's physical examination was essentially normal. (*Id.* at 449-60.)

In sum, the ALJ's credibility determination is supported by substantial evidence,

including objective medical evidence that Coleman's right leg had healed following surgery and that he was able to walk with a cane within months after the surgery.  (*See id.* at 263-64.)  As such, the ALJ's credibility finding is not so unreasonable or unsupported by the evidence that reversal is warranted.  *See Prochaska*, 454 F.3d at 738.  In other words, the ALJ's credibility determination is not patently wrong.  *See id.*

## IV.    Listing 1.02 – "A Major Dysfunction of a Joint"

Coleman also argues that the ALJ erred by not finding that he met Listing 1.02A, "A Major Dysfunction of a Joint," which incorporates the definition of "ambulating effectively" found in Listing 1.00B2b.  To recap, in step three of the Commissioner's five-step, sequential analysis "evidence demonstrating the claimant's impairments is compared to a list of impairments presumed severe enough to preclude any gainful work."  *See Rice,* 384 F.3d at 365.  The "List of Impairments" or the "Listings" refer to Appendix I, Subpart P, Part 404 of the Regulations.  *See id.*  A person whose impairment meets or equals an impairment in the Listings is presumptively disabled and the ALJ need not reach steps four and five of the sequential analysis.  *See* 20 C.F.R. § 416.920(d); *see also Rice,* 384 F.3d at 365.  "For a claimant to show that his impairment matches a listing, it must meet ***all*** of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (emphasis in original).  Coleman bears the burden of proof at this step of the analysis.  *See Briscoe,* 425 F.3d at 352.

Listing 1.02A states:

Major dysfunction of a joint(d) due to any cause:  Characterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis,

19

instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: A. Involvement of one major peripheral weight-bearing joint (i.e. hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

*See* 20 C.F.R. Pt. 404, Subpt. P., App. § 1.02A.  Listing 1.00B2b defines ineffective ambulation and outlines examples, such as "inability to walk without the use of a walker, two crutches or two canes, [or] the inability to walk a block at a reasonable pace on rough or uneven surfaces." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B2b2.

In concluding that Coleman did not meet the criteria in Listing 1.02A, the ALJ concluded that the record did not establish that Coleman's "physical impairment 'interferes very seriously' with his ability to 'initiate, sustain or complete activities,' primarily because [Coleman] does not require the use of both upper extremities to accomplish ambulation, instead using a single cane, and even that apparently not consistently."  (Certified Copy of Administrative Record, at 32.) There is substantial evidence in the record to support the ALJ's findings as to Listing 1.02A, especially because Coleman used one cane –  not a walker, two crutches, or two canes as required by 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B2b2.  In March 2000, for example, Dr. Evanich reported that Coleman was able to walk with a cane within a few months after surgery. (*Id.* at 263-64.)  Furthermore, Dr. Elmes' reported that Coleman's strength in his upper extremities and left leg were normal, but limited in the right leg, and thus Coleman used a cane on the right for ambulation.  (*Id.* at 477.)  There is also evidence that – at times – Coleman did not use a cane at all, including when he was incarcerated in 2003.  (*Id.* at 449, 455.)  Finally, the ALJ's finding is consistent with the regulatory definition which contemplates the use of hand-held assistance devices in both hands, such as two crutches or a walker.  *See* 20 C.F.R. Pt. 404,

Subpt. P, App. 1 § 1.00B2b2.  Therefore, the ALJ applied the correct legal standard under the circumstances, as well.  *See Briscoe*, 425 F.3d at 351.

## V.      Level of Literacy & General Education Level

Coleman also contends that the ALJ did not properly analyze his functional level of literacy or educational level.  In examining Coleman's severe impairments under step two of the sequential analysis, the ALJ addressed Dr. Hilger's psychological examination of Coleman, Coleman's IQ tests, and Dr. Hilger's diagnosis that Coleman suffered mild mental retardation, depression, and cognitive delay.  (Certified Copy of Administrative Record, at 22.)  The ALJ rejected counsel's assertion that Coleman was mentally retarded and illiterate, but instead concluded that Coleman's education limited him to simple, unskilled work.  (*Id.*)

Under step three of the analysis, the ALJ considered whether Coleman's impairment matched Listing 12.05 for mental retardation.  (*Id.* at 34.)  In doing so, the ALJ rejected Coleman's argument that he was in special education classes at Medill elementary school because his school records did not reflect that he was in any such program.  (*Id.* at 35.)  In fact, the ALJ noted that in other contexts Coleman denied that he was ever in special education classes.  (*Id.*)  The ALJ also concluded that Coleman had normal adaptive skills based on his work experience as a bus boy at Arlington Racetrack and his work at the carwash in Milwaukee. (*Id.*)  She also based her conclusion on evidence that Coleman learned to drive a car, got driver's licenses in Wisconsin and Illinois, and took public transportation on his own.  *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("One wonders how [the claimant] can be 'illiterate' if he could take and pass the tests required of truck drivers").

The ALJ further concluded that Coleman gave materially inconsistent statements and

testimony about his educational background and literacy. In his initial disability report, for instance, Coleman stated that he was able to read and write in English, although he also indicated that he could not speak English. (*Id.* at 40.) Moreover, the ALJ considered Coleman's testimony that he could not read, but also noted that Coleman later testified he could read small words and do arithmetic very slowly. (*Id.*) The ALJ also noted that Coleman's school records reflected that he completed eighth grade and achieved average or satisfactory grades. (*Id.* at 41.) Further, the ALJ relied on Dr. Hilger's report that Coleman's performance on his academic achievement tests did not accurately reflected his ability to read and write. (*Id.*)

In sum, the ALJ's factual findings are based on substantial evidence in the record, including Dr. Hilger's psychological examination, Dr. Hilger's diagnosis, Coleman's IQ tests, Coleman's hearing testimony concerning his ability to work and get driver' licenses, Coleman's academic records, and Coleman's own testimony concerning his literacy. *See Young,* 362 F.3d at 1001 (evidence is substantial if reasonable person accepts it as adequate to support conclusion). As such, Coleman's argument that the ALJ did not properly analyze his functional level of literacy or education level fails.[1]

## VI. Reliance on Vocational Expert's Testimony

Coleman further argues that the ALJ failed to explore the inconsistencies between the vocational expert's testimony and information in the Department of Labor's Dictionary of

---

[1] Despite the ALJ's thorough analysis, Coleman argues that the ALJ had a heightened duty to further explore his claims of illiteracy. *See Taylor v. Apfel,* No. 00 C 3556, 2003 WL 21087955, at *4 (N.D. Ill. May 13, 2003) (citing *Vaile v. Chater,* 916 F.Supp. 821, 829 (N.D. Ill. 1996)). Coleman, however, fails to recognize that this "heightened duty" only applies if the claimant is unassisted by counsel and the ALJ has failed to secure a valid waiver of counsel. *See Vaile,* 916 F.Supp. at 829. As discussed, Coleman had counsel during these proceedings, and thus this argument is misplaced.

Occupational Titles ("DOT") as required by Social Security Ruling 00-4p. *See Prochaska*, 454

F.3d at 735 (SSR 00-4p requires ALJ to determine whether a vocational expert's testimony is

consistent with the DOT). The ruling specifically states:

> When a VE [vocational expert] or VS [vocational specialist] provides evidence
> about the requirements of a job or occupation, the adjudicator has an affirmative
> responsibility to ask about any possible conflict between that VE or VS evidence
> and information provided in the DOT. In these situations, the adjudicator will:
>
>> – Ask the VE or VS if the evidence he or she has provided conflicts with
>> information provided in the DOT; and
>>
>> – ***If the VE's or VS's evidence appears to conflict with the DOT***, the adjudicator
>> will obtain a reasonable explanation for the apparent conflict.

*See* 65 Fed. Reg. 75759, 75760 (emphasis added); *see also Prochaska*, 454 F.3d at 735.

At the hearing, the ALJ fulfilled the first prong of SSR 00-4p by asking the vocational

expert about the differences between her job descriptions and the DOT definitions to which

Gianforte explained that the DOT descriptions sometimes gave more detail than her descriptions.

(Certified Copy of Administrative Record, at 580-81.) As to the second prong, because

Gianforte's testimony did not "appear to conflict" with information in the DOT, the ALJ was not

required to obtain an explanation under SSR 00-4p. More specifically, in examining whether

there were occupations that existed in significant numbers in the regional economy, the ALJ

asked Gianforte if she could identify occupations in a clerical environment. (*Id.* at 583.)

Gianforte identified the occupations of order clerk, telephone order taker, and information clerk

and explained that these occupations had a Special Vocational Preparation ("SVP") time of 2 and

were sedentary.[2] (*Id.* at 583-84.) Indeed, each one of these clerical jobs – information clerk

---

[2] "The DOT lists a specific vocational preparation (SVP) time for each described
occupation. Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled

(237.367-018); order clerk (209.567-014); and phone order taker (*i.e.,* call-out operator, 237.367-014) – has an SVP of 2.  Last, Gianforte testified that 1,500 jobs existed in the regional economy in each category.  (*Id.*)

Nonetheless, Coleman argues that Gianforte testified that these specific clerical occupations had reasoning and language levels from 1 to 2 and that this testimony conflicts with information in the DOT.  Gianforte, however, did not testify that these specific occupations had reasoning and language levels from 1 to 2.  (Certified Copy of Administrative Record, at 585-593.)  Instead, Gianforte testified that, in general, a SVP of 2 means that educational development in reasoning, math, and language will range from a 1 to a 2.  (*Id.* at 586.)  She further testified that 38 percent of the occupations listed in the DOT are associated with a general educational development level of 1 or 2.  (*Id.*)  In fact, when Coleman's attorney asked Gianforte about the specific general educational development scores for these clerical jobs, she explained that she did not have that information from the DOT in front of her, thus she did not give exact levels for these occupations.  (*Id.* at 585-86.)

As such, the underlying premise of Coleman's argument, namely, that Gianforte testified that these specific clerical occupations had language and reasoning levels of 1 to 2, is faulty.  Meanwhile, although Gianforte's testimony concerning the DOT definitions was somewhat confusing, much of this confusion was due to counsel's questioning.  In other words, counsel's attempt – at the hearing and in briefs to this Court – to create a conflict between Gianforte's testimony and the DOT definitions cannot be the basis for remanding this matter to the ALJ.  *See*

---

work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *See* 65 Fed. Reg. 75759, 75760.

*Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000) (claimant cannot scour record for unexplained or implied conflicts between expert testimony and DOT and then present these conflicts as reversible error).

In sum, because Gianforte's testimony on direct and cross-examination did not conflict with the DOT, the ALJ was not required to obtain a reasonable explanation for any such conflict. *See* 65 Fed. Reg. at 75760.

**VII.    Breakdown of Jobs**

Finally, Coleman argues that the vocational expert's testimony concerning the breakdown of jobs in the regional economy was not properly supported by data, and thus unreliable. Indeed, an ALJ may only depend on expert testimony that is reliable. *See McKinnie v. Barnhart,* 368 F. 3d 907, 910-11 (7th Cir. 2003) (per curiam). As the Seventh Circuit explains, "every decision must be supported by substantial evidence... [e]vidence is not 'substantial' if vital testimony has been conjured out of whole cloth." *Donahue,* 279 F.3d at 446.

At the hearing, the vocational expert, Gianforte, testified that she did not use a statistical analysis, but instead based her conclusion concerning the number of clerical jobs in the regional economy on a statistical survey performed by a company that analyzed the 12,741 occupations listed in the DOT. (Certified Copy of Administrative Record, at 589.) Further, Gianforte testified that this company categorized a number occupations, such as clerks and cashiers, that are unskilled, semi-skilled, and skilled and also categorized whether these occupations are sedentary, light, medium, or heavy. (*Id.*) Gianforte also noted that the company does its analysis in the context of major occupations that provide the greatest employment opportunities. (*Id.* at 590.)

Moreover, Gianforte testified that the statistics she used were nationwide statistics, and thus she relied on the Department of Labor's 2005 edition of the "Occupational Outlook Handbook" and the State of Illinois Department of Employment Security's 2005 edition of "Occupational Projections" to break down the numbers for the Chicago metropolitan area. (*Id.* at 588-91.) In addition, she testified that she did not include the full range of order clerks, but used a conservative number that would fit the limitations of the hypothetical. (*Id.* at 588.)

Coleman nevertheless makes the perfunctory argument that because Gianforte admitted that she did not rely on a statistical analysis to break down the number of regional jobs, her testimony was unreliable. Coleman, however, does not explain how the process Gianforte used was unreliable, nor does he cite to any legal authority holding that a vocational expert's testimony is per se unreliable if she does not rely on a statistical analysis (the exact nature of which Coleman never explains). In sum, Coleman's bare-boned argument that because Gianforte did not rely on a statistical analysis – without more – does not save the day. In fact, based on Gianforte's testimony, the Court would be hard-pressed to conclude that her "testimony ha[d] been conjured out of whole cloth," and thus unreliable. *See Donahue,* 279 F.3d at 446. Therefore, Coleman's last argument fails.

## CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment and denies Coleman's Motion for Summary Judgment. The Court affirms the ALJ's decision.

**Dated**:  January 31, 2007

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**